SCHEDULED FOR ORAL ARGUMENT ON MARCH 31, 2017

No. 16-7076

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DL, *et al.*,
APPELLEES,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR THE DISTRICT OF COLUMBIA APPELLANTS
(FINAL VERSION)**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

LUCY E. PITTMAN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 727-3881
lucy.pittman@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—Defendants below and appellants here are the District of Columbia and, in their official capacities, Superintendent of Education Hanseul Kang and Interim Chancellor John Davis, as successors to Deborah Gist, Michelle Rhee, Clifford Janney, and Kaya Henderson under Federal Rule of Appellate Procedure 43(c)(2).

Plaintiffs named below in the second amended complaint were minors, by their parents and next friends, who on their own behalf and on behalf of classes of similarly situated individuals are appellees here, as specified:

### SUBCLASS 1

Representatives: D.L., by parent and next friend Tameka Ford, and J.B., by parent and next friend Leah Bland:

> All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the [Individuals with Disabilities Education Act ("IDEA")], lived or will live in, or were or will be wards of, the District of Columbia, and were not or will not be identified and/or located for the purposes of offering special education and related services.

### SUBCLASS 2

Representatives: T.F., by parent and next friend Angelique Moore, and H.W., by parents and next friends Kerianne Piester and Ronald Wiser:

> All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia,

and did not or will not receive an initial evaluation within 120 days of the date of referral for the purposes of offering special education and related services.

## SUBCLASS 3

Representatives: D.L., by parent and next friend Tameka Ford, H.W., by parents and next friends Kerianne Piester and Ronald Wiser, and T.F., by parent and next friend Angelique Moore:

All children, who, when they were or will be between the ages of three and five, were or will be disabled, as defined by the IDEA, lived or will live in, or were or will be wards of, the District of Columbia, and did not or will not receive a determination of eligibility within 120 days of the date of referral for special education and related services.

## SUBCLASS 4

Representatives: X.Y., by parents and next friends Tammika Thompson-Young and Bryan Young, and T.L., by parents and next friends Arlette Mankemi and Timothy Lantry:

All children with disabilities, as defined by the IDEA, who lived in or will live in, or are or will be wards of, the District of Columbia, and who participated or will participate in early intervention programs under Part C of IDEA, and who participated or will participate in preschool programs under Part B, and who did not or will not have a "smooth and effective" transition from Part C to Part B by the child's third birthday. A transition shall be considered "smooth and effective" if (1) the transition begins no less than 90 days prior to the child's third birthday; (2) the child is provided with an [individualized education program] listing both the type of placement and a specific location for services by the child's third birthday; (3) there is no disruption in services between Part C and Part B services; and (4) Part B personnel are involved in the transition process.

Joint Appendix ("JA") 285-319 (certification order and opinion), 320-56 (second amended complaint).

F.D., by parents and next friends Frederick and Monica Davy, was included in the Second Amended Complaint as a plaintiff but was not included as a representative of any of the four subclasses. JA310-11, 320, 332-34.

*Amici curiae* for appellees include the Lawyers' Committee for Civil Rights Under Law, AARP and AARP Foundation, National Federation of the Blind, Council of Parent Attorneys and Advocates, Disability Rights DC at University Legal Services, Bazelon Center for Mental Health, National Health Law Program, and National Disability Rights Network.

B. *Rulings under review*.—Appellants appeal from the district court's (Lamberth, J.) Order and Memorandum Opinion denying the District's motion to dismiss, JA1080-1109 (available at *DL v. District of Columbia*, No. 05-1437, 2016 WL 2901720 (D.D.C. May 18, 2016)), and the Order and Memorandum Opinion and Findings of Fact and Conclusions of Law granting an injunction and other relief that was entered following a bench trial, Record Document ("RD") 520, JA1110-21, 1124-1253 (corrected findings) (available at *DL v. District of Columbia*, No. 05-1437, 2016 WL 3460306 (D.D.C. June 21, 2016)), and all other orders merged therein, or related to, underpinning, or intertwined in those orders.

C. *Related cases*.—This case was previously before this Court in D.C. Cir. Nos. 11-7153 and 12-7042, and on April 12, 2013, this Court entered a decision vacating the district court's class-certification, liability, and remedial orders and remanding the matter to the district court. *DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013). The case was also before this Court on a subsequent petition for permission to appeal under Federal Rule of Civil Procedure 23(f), D.C. Cir. No. 13-8009, which was denied in an unpublished order on January 30, 2014.

Appellants are not aware of any related cases, but note that a related class-certification issue may be before this Court in D.C. Cir. No. 16-5125. There, the district court dismissed as moot a class action where the named plaintiffs' claims became moot after the certification request. *Heard v. U.S. Soc. Sec. Admin.*, No. 15-230, 2016 WL 1032777, at *1 (D.D.C. Mar. 15, 2016).

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................1

    1.    Statutory Background........................................................3

    2.    Proceedings Through This Court's Vacatur Of The Original Class Certification And Related Rulings ...............................6

    3.    On Remand, Certification Of Subclasses Defined Around Statutory Requirements Rather Than Policies Or Practices, At A Time When The Named Plaintiffs' Claims Undisputedly Had Become Moot .......................................................................8

    4.    Evidence At Trial, Findings Of Fact, And The Court's Injunctive And Declaratory Relief .......................................9

        a.    The District's child-find system.................................10

        b.    Monitoring by the Secretary of Education................15

        c.    Plaintiffs' analysis and the court's findings.............16

            i.    Subclass 1 ......................................................17

            ii.    Subclass 3 ......................................................21

            iii.    Subclass 4 ......................................................23

STANDARD OF REVIEW .................................................................25

SUMMARY OF ARGUMENT .............................................................26

ARGUMENT ....................................................................................28

    I.    The District Court Lacked Jurisdiction To Certify The Class Because The Named Plaintiffs Had No Legally Cognizable Interest In The Case When They Moved For Certification ...............28

    A.    A court cannot certify a class if the named plaintiffs' claims are moot when they seek certification ............................29

    B.    No exception to the mootness doctrine allowed these named plaintiffs to seek certification ........................................30

II.    Class Certification Was Improper Under Rule 23 .............................34

    A.    The subclasses do not satisfy Rule 23(a)(2) .............................35

    B.    The classes also do not satisfy the typicality and adequacy-of-representation requirements of Rule 23(a) or the "indivisible" injunction requirement of Rule 23(b)(2) .......41

III.    The Law And The District Court's Findings Do Not Support The Structural Injunction And Declaratory Relief .............................43

    A.    The findings of noncompliance are based on underlying legal rulings contrary to IDEA's plain language .....................43

    B.    Structural relief based on supposed statistical deficiencies rather than the identification of inadequate policies or practices is contrary to IDEA ....................................................54

    C.    Procedural violations alone do not demonstrate a failure to provide FAPE........................................................................57

    D.    There are no findings that the programmatic requirements in the injunction are designed to cure a current harm...............58

CONCLUSION .......................................................................................60

## TABLE OF AUTHORITIES*

### *Cases*

*Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980)..........................................38, 41

*Already, LLC v. Nike, Inc.*, 133 S. Ct. 721 (2013)...................................................28

*Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291 (2006)................................3, 56

*Blackman v. District of Columbia*, 633 F.3d 1088 (D.C. Cir. 2011)......................57

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ...................................................................................42

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*,
797 F.3d 426 (7th Cir. 2015) ...................................................................................25

*Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004) .............................................43, 53

*\*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005).........................................43, 59

*Cordero by Bates v. Pa. Dep't of Educ.*, 795 F. Supp. 1352 (M.D. Pa. 1992).. 53-54

*Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ......................................30, 32

*\*Culver v. City of Milwaukee*, 277 F.3d 908 (7th Cir. 2002) ..................... 33-35, 42

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977) ........................................44

*D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503 (2d Cir. 2006)...................50

*Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006) .......................................42

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009).................................................................................25

*Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326 (1980)............35

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

*DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013) ..................2, 7, 36-37, 40

*Exch. Nat'l Bank of Chi. v. Daniels*, 763 F.2d 286 (7th Cir. 1985).........................34

*Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013) .................. 29, 31-33

*Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ..........................................................35

*Gerstein v. Pugh*, 420 U.S. 103 (1975).....................................................................32

*Gulf Oil Corp. v. Brock*, 778 F.2d 834 (D.C. Cir. 1985) ..........................................59

*Horne v. Flores*, 557 U.S. 433 (2009) .....................................................................44

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ...........................48

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013).....................................................................................35

*Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481 (7th Cir. 2012) .............. 37, 40-41

*Leggett v. District of Columbia*, 793 F.3d 59 (D.C. Cir. 2015)................................57

*Lewis v. Casey*, 518 U.S. 343 (1996)................................................................. 43-44

*Lusardi v. Xerox Corp.*, 975 F.2d 964 (3d Cir. 1992) ............................... 31-32, 34

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012) ...........................38

*MM ex rel. DM*, 303 F.3d 523 (4th Cir. 2002) ........................................................51

*Missouri v. Jenkins*, 515 U.S. 70 (1995).........................................................44, 46

*Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609 (7th Cir. 2002) ................29

*N.G. v. District of Columbia*, 556 F. Supp. 2d 11 (D.D.C. 2008) ..........................58

*N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426 (1941) ................................................53

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)....................................................28

viii

*P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*,
585 F.3d 727 (3d Cir. 2009) .....................................................................47

*Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516 (D.C. Cir. 2005) ..............57

*Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985) .... 55-56

*\*Sosna v. Iowa*, 419 U.S. 393 (1975) ......................................................... 29-32, 42

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998)................................41

*United States v. Philip Morris*, 566 F.3d 1095 (D.C. Cir. 2009)...........................26

*\*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ........................... 30-32, 42

*\*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)......1, 7, 27, 35-38, 40-43, 57

## Constitutional Provisions

U.S. Const. Art. III.................................................................................28, 34

## Statutes and Regulations

20 U.S.C. § 1400 .........................................................................................3

20 U.S.C. § 1401 .............................................................................. 3-4, 12, 51

*20 U.S.C. § 1412 ..............................................................3-5, 32, 45, 47-49, 51

*20 U.S.C. § 1414 ...................................................................4-5, 14, 47, 50-51

*20 U.S.C. § 1415 .................................................................................. 6, 54-56

*20 U.S.C. § 1416 .................................................................................6, 55, 57

20 U.S.C. § 1419 .........................................................................................8

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

28 U.S.C. § 1367 .........................................................................................1

28 U.S.C. § 2072 ...............................................................................57

29 U.S.C. § 794(a) .............................................................................6

D.C. Code § 38-2561.02 ...........................................................5, 14, 47

D.C. Code § 38-2601 .........................................................................10

34 C.F.R. § 300.101 ...........................................................................49

34 C.F.R. § 300.124 ...........................................................................49

34 C.F.R. § 300.641 ...........................................................................20

34 C.F.R. § 300.300 .......................................................................5, 14

34 U.S.C. § 300.301 ...........................................................................21

34 C.F.R. § 300.323 ....................................................................5, 49-50

34 C.F.R. § 303.209 .............................................................................5

*Other*

*Fed. R. Civ. P. 23 ....................................7, 27, 34-35, 37, 39, 41-42, 57

## GLOSSARY

DCPS                District of Columbia Public Schools

FAPE                free appropriate public education

JA                  Joint Appendix

IDEA                Individuals with Disabilities Education Act

IEP                 individualized education program

OSSE                Office of the State Superintendent of Education

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the federal and local claims under 28 U.S.C. §§ 1331 and 1367.  Appellants noted appeals of the district court's May 18, 2016 decision on June 16, 2016, and of the court's June 21, 2016 corrected findings on June 24, 2016.  Joint Appendix ("JA") 1122, 1254.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether this Court should order the case dismissed because the named plaintiffs' claims were undisputedly moot when they sought class certification.

2.  Whether this Court should order dismissal because the certification ruling conflicts with *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), and this Court's decision overturning the prior class certification in the case.

3.  Whether, at minimum, this Court should vacate the liability and relief rulings because the structural injunction entered is contrary to the Individuals with Disabilities Education Act and the rulings are based on legal errors and nonspecific findings that do not support such an injunction and the related declaratory relief.

## STATEMENT OF THE CASE

This case, filed in 2005, challenges the District of Columbia's system implementing the "child-find" provisions of the Individuals with Disabilities Education Act ("IDEA") for preschool-aged children.  The district court certified a class of children claiming this complex system had failed them in a variety of

distinct ways, and entered relief.  This Court vacated the class and the associated relief for want of commonality, because the class did not challenge any specific policy or practice affecting all class members.  *DL v. District of Columbia*, 713 F.3d 120 (D.C. Cir. 2013).

Although it was undisputed on remand that the named plaintiffs' claims were moot, plaintiffs' counsel did not seek to name new plaintiffs.  Further, they sought the same class already vacated by this Court—with no meaningful change other than formal subdivision into four subclasses.  Rather than dismiss at this point and allow any class members with live claims to seek relief in new proceedings, the court certified the subclasses.

By the time of trial in 2015, everyone agreed that the system had been transformed, with improvements in every child-find requirement.  The District had made a child- and family-centered program that finds disabled preschool children, evaluates them, and determines if they are eligible for services.  The system also provides early-intervention services and transitions children to preschool services by their third birthday.  The court nonetheless entered a structural injunction and declaratory relief based on disputed statistical projections about the numbers of children that should be served if the program was operating lawfully, and the timing of those services, rather than findings that specific policies or practices were improper.

2

## 1.    Statutory Background.

In IDEA, Congress recognized that "States" including the District "are primarily responsible for providing an education for all children with disabilities," and that "it is in the national interest that the Federal Government have a supporting role in assisting State and local efforts."   20 U.S.C. § 1400(c)(6). Congress recognized the goal of "ensur[ing] that all children with disabilities have available to them a free appropriate public education" ("FAPE"), and recognized its role in "assist[ing] States" in providing education.  *Id.* §§ 1400(d), 1401(9).

Consistent with that recognition, "Congress enacted the IDEA pursuant to the Spending Clause."  *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 295 (2006).  Section 1412(a) allows a state to receive funds if it "submits a plan that provides assurances" to the Secretary of Education that it "has in effect policies and procedures to ensure that" it meets the conditions in twenty-five subsections. 20 U.S.C. § 1412(a).  At issue here are subsections (1), (3), and (9), which require states accepting funds to have policies and procedures to ensure:

> (1) A [FAPE] is available to all children with disabilities … between the ages of 3 and 21….
>
> (3) All children with disabilities …[,] who are in need of special education and related services, are identified, located, and evaluated….
>
> (9) Children participating in early intervention programs assisted under subchapter III [Part C of IDEA ("Infants and Toddlers with Disabilities")], and who will participate in preschool programs assisted under [subchapter II] [Part B of IDEA ("Assistance for

3

Education of All Children with Disabilities")], experience a smooth and effective transition to those preschool programs….

*Id*. "[C]hildren with disabilities" are those:

> (i) with intellectual disabilities, hearing impairments[,] speech or language impairments, visual impairments[,] serious emotional disturbance[,] orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, need[] special education and related services.

*Id.* § 1401(3)(A).

To provide services sufficient for a FAPE to children with disabilities under subsection (1), IDEA generally requires the District of Columbia Public Schools ("DCPS") to individualize services through individualized education programs ("IEPs"). *Id.* §§ 1412(a)(4), 1414(d). These plans must contain the "projected date for the beginning of the services … and the anticipated frequency, location, and duration of those services," and must be developed and approved by a team that includes the child's parent(s) and education professionals. *Id.* § 1414(d)(1).

Subsection (3) encompasses identification, location, and evaluation. "[I]dentification" and "location" require outreach and community involvement to find children suspected of being disabled. After identification and location, the "evaluation" process requires a multidisciplinary team to evaluate the child and satisfy IDEA's numerous requirements in doing so. *Id.* § 1414. The initial evaluation must be conducted and an eligibility determination made "within 60

4

days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted, within such timeframe." *Id.* § 1414(a)(1)(C)(i). The District set the timeframe at 120 days. D.C. Code § 38-2561.02(a). An evaluation cannot be conducted absent "informed parental consent." 20 U.S.C. § 1414(a)(1)(D), (c)(3); 34 C.F.R. § 300.300.

Subsection (9) requires a "smooth and effective" transition from a program administered by the District's Office of the State Superintendent of Education ("OSSE") (known as "Part C") to the program administered by DCPS ("Part B"). JA1143-44; 20 U.S.C. § 1412(a)(9). The "smooth and effective transition" must begin at least 90 days before the child's third birthday, provide for uninterrupted services, and include Part B personnel. 34 C.F.R. § 303.209. The planning must include a conference with the family and school officials to develop a transition plan and an IEP (or an "Individual Family Service Plan"). 34 C.F.R. §§ 303.209, 300.323(b).

Because Section 1412 speaks to funding conditions, and thus to the relationship between federal and state governments, Congress spoke separately in IDEA about how individuals may enforce its conditions. Section 1412 itself has a funding condition that states ensure that "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by section 1415." 20 U.S.C. § 1412(a)(6).

5

Section 1415 ("Procedural safeguards") establishes that states receiving funding must provide any party an opportunity to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE]." 20 U.S.C. § 1415(b)(6). A party who exhausts administrative remedies and remains "aggrieved by the findings and decision" may bring "a civil action with respect to the complaint presented." *Id.* § 1415(i)(2)(A). Based on the administrative record and additional evidence admitted at a party's request, the court "shall grant such relief as [it] determines is appropriate." *Id.* § 1415(i)(2)(C).

Congress also established a systemic enforcement mechanism not involving actions brought by individuals—oversight by the Secretary of Education. The Secretary is required to monitor state compliance with, *inter alia*, the three funding conditions at issue. *Id.* § 1416(a)(1)-(3). States must provide performance plans with "measurable and rigorous targets" on these conditions. *Id.* § 1416(b)(2)(A). On annual review, the Secretary may withhold or recover funds because of poor performance or enter into corrective action plans with the state. *Id.* § 1416(d)-(e).

**2.   Proceedings Through This Court's Vacatur Of The Original Class Certification And Related Rulings.**

In 2005, certain minor plaintiffs sued and alleged, *inter alia*, violations of IDEA's child-find provisions; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); and District law. Record Document ("RD") 1. The district court certified

6

a broad class of plaintiffs.  JA90.  Shortly after trial, the District moved to decertify the class based on the Supreme Court's decision in *Wal-Mart*.  RD214.  Under *Wal-Mart*, plaintiffs had to show that the potential class members' claims "depend upon a common contention" "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  564 U.S. at 350.  The district court acknowledged "that classmembers' denial of a FAPE occurred for a multitude of different reasons," but nevertheless found commonality because "[a]ll of the class members have suffered the same injury: denial of their statutory right to a [FAPE]."  JA227, 229.

The court issued findings and conclusions of law that the District violated IDEA, the Rehabilitation Act, and local law.  JA162-215.  It issued a sweeping structural injunction, with programmatic and numerical requirements that would remain in effect until the District demonstrated sustained compliance.  JA207-15.

On appeal, this Court vacated the class certification, liability findings, and injunctive relief.  *DL*, 713 F.3d at 129.  It remanded for a determination whether any class or subclasses could be certified consistent with the admonition that "[i]n the absence of identification of a policy or practice that affects all members of the class in the manner *Wal-Mart* requires," a class does not meet "the Court's interpretation of [Fed. R. Civ. P. ('Rule')] 23(a) commonality."  *Id*. at 126.

7

**3.      On Remand, Certification Of Subclasses Defined Around Statutory Requirements Rather Than Policies Or Practices, At A Time When The Named Plaintiffs' Claims Undisputedly Had Become Moot.**

After remand, there remained seven plaintiffs between the ages of 10 and 15. RD61.  Plaintiffs sought leave to file a second amended complaint and to certify subclasses again defined by reference to particular statutory requirements rather than challenged policies or practices.  RD358-59.  The new complaint identified only the same seven plaintiffs even though none had a live claim (because their claims were resolved by 2009 or earlier through the administrative process and service delivery, and the relevant IDEA provisions did not apply because the plaintiffs were over five years old).  JA281-84; 20 U.S.C. § 1419(a).

The District moved to dismiss plaintiffs' claims as moot and opposed class certification.  RD365; RD370.  The court declined to dismiss, finding—without citing legal authority—that because of the "lengthy and peculiar circumstances" of the case, plaintiffs' request for class certification should relate back over eight years to the first certification request.  JA314-15.  The court then certified four subclasses and assigned six of the seven plaintiffs to represent one or more of them.  JA310-11.  The classes were defined generally as preschool children who were not identified or located (subclass 1); did not receive a timely initial evaluation (subclass 2); did not receive a timely eligibility determination (subclass 3); and did not have a smooth and effective transition from Part C to Part B

8

services by their third birthday (subclass 4). JA310-11. The District unsuccessfully sought interlocutory review under Rule 23(f). D.C. Cir. No. 13-8009.

The parties took additional discovery and engaged in further litigation. RD416-17. The court granted plaintiffs partial summary judgment, finding that the District violated IDEA and District law for the period up to April 6, 2011, but denied plaintiffs summary judgment on their Rehabilitation Act claims for that period. JA398. The court granted partial summary judgment to the District on plaintiffs' IDEA and District law claims related to timely evaluating children for special education and related services for the period from April 6, 2011 to the present (subclass 2), and all of plaintiffs' Rehabilitation Act claims for the period from March 22, 2010 onward. JA398-99, 630.

### 4. Evidence At Trial, Findings Of Fact, And The Court's Injunctive And Declaratory Relief.

The remaining claims concerned whether the District violated (1) IDEA and District law with regard to subclasses 1, 3, and 4 from April 6, 2011 to trial, and (2) the Rehabilitation Act for the period up to March 22, 2010 for each subclass. JA1130-31. The court held a bench trial in November 2015.

Plaintiffs had three witnesses: Dr. Carl Dunst, an expert in child-find obligations for preschool-age children; Dr. Leonard Cupingood, an expert in

statistics; and Lauren Seffel, an attorney for plaintiffs.     JA1133, 1136-37. Plaintiffs submitted 305 exhibits.  JA633-34.

The District submitted testimony of 14 witnesses, including Dr. Maxine Freund, an expert on child-find obligations as they relate to preschool children, and a parent who had experienced the District's child-find program.  JA507-86, 1137-41.  The District submitted 55 exhibits.  JA680.

### a.     The District's child-find system.

The evidence established that the District's child-find system was functioning well at the time of trial, and had improved markedly in the decade since this suit began.   The District implements its child-find obligations for preschool children primarily through two agencies.  JA507-17, 534-53, 576-86, 1142-46.  In June 2007, OSSE was created as a standalone agency that sets state-level policies for, *inter alia*, implementing IDEA child-find requirements.  D.C. Code § 38-2601 *et seq*.; JA507-17, 576-86, 914-29.  OSSE monitors compliance of local education agencies—DCPS being the largest in the jurisdiction—and reports compliance to the Secretary of Education.   JA507-17, 914-29, 1144-46.   In addition, OSSE provides Part C services to disabled children younger than three years. JA518-21, 1143.

"Early Stages" is a division of DCPS responsible for implementing child-find policies under IDEA Part B.  JA534, 1142.  Early Stages has developed a

10

program for identifying and locating disabled preschool children and evaluating their eligibility for special education and related services, and for transitioning children from OSSE's Part C to DCPS's Part B services.  JA534-53, 576-86, 914-29.

In 2011, before the earlier appeal, the district court found systemic problems with the District's child-find system.  JA162-206; *see* JA704 ("I start with where—what I saw in 2011 . . . how [] awful things were, at least as of 2009 and 2010.  So I don't come at this fresh either.").  But, the court agreed, "there was a fundamental shift" after DCPS and OSSE hired Drs. Nathaniel Beers and Amy Maisterra to reform the system.  JA705.  During the last decade, the District has made significant improvements.  JA1131, 1137, 1147-48.  It has a highly regarded leadership team, *see* JA690 ("I think you're one of the best things to happen to D.C. Schools."), and has built a robust child-find system.  *See generally* JA507-86, 914-29.  In 2015, plaintiffs did not submit evidence that the 2011 systemic problems remained or evidence of other systemic problems, and the court did not have systemic findings in 2015 comparable to those in 2011.  JA1186 ("Plaintiffs concede that their evidence is less thorough than it was at prior stages in this litigation."), JA1217 ("Plaintiffs identified fewer programmatic failures than at previous stages in this case.").  Indeed, the evidence showed strong programs in each of the three subclasses remaining for trial:

11

*Identifying Children (subclass 1).*  Identifying and locating children with disabilities prior to formal school age is no small task.  The disabilities vary by type and degree and include "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance…, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities," 20 U.S.C. § 1401(3), and are found in children in widely disparate socioeconomic circumstances in the District—and, in the case of District wards, in other jurisdictions.

To address this large and multifaceted task, Early Stages developed a vast network of 854 organizations that refer children suspected of having a disability for evaluation.  JA535-41, 581-84, 706-17.  Its outreach efforts include all eight wards in the District and target a range of organizations to include the entire preschool population.  JA534-53.  The organizations include: schools, medical providers/clinics, libraries, recreation centers, daycare providers, homeless shelters, social service organizations, income-maintenance service centers, the Superior Court's Family Court, and mental health organizations.  JA536-38, 540-42.  It regularly conducts outreach to maintain and expand the network.  JA538.  It publishes materials for parents about cost-free services provided to preschool children and distributes them District-wide.  JA537-40, 581-84, 781-86, 791-802.

12

Early Stages trains its referring partners on how to screen for disabilities and navigate the referral process.  JA537-41, 581-84, 793-94.  In fiscal year 2015, for example, Early Stages provided 449 training sessions to 227 different organizations and 220 workshops for parents.  JA540-41.  Early Stages also provides free screening kits to primary referrers to help identify children to be referred for evaluation.  JA541-42, 581-84, 686-88.

Early Stages has two locations and also holds office hours at the central intake site and the shelter for homeless families in order to identify homeless children who are disabled.  JA528, 540-42, 581-84.  It has processes with the District's Child and Family Services Agency to screen all preschool-aged children in foster care and with the Department of Environment to refer children with elevated lead levels.  JA527-28, 540-42, 578-79.  It also uses geomapping technology to identify low-referral areas to determine if additional outreach is needed.  JA528, 543.

*Eligibility Determinations (subclass 3).*  Early Stages is responsible for evaluating children who have been referred and determining if they are eligible for special education and related services.  JA534-53, 787-90.  After a child is referred to Early Stages, the next step is to locate the parent to obtain informed consent to conduct the evaluation.  JA544, 718-51, 761-73, 787-90.  The evaluation and

eligibility determination must be issued within 120 days of receiving parental consent. 20 U.S.C. § 1414(a)(1); D.C. Code § 38-2561.02(a); 34 C.F.R. § 300.300.

Early Stages tries to contact parents using multiple modalities, including phone and mail. JA545-46, 706-17, 761-73, 1190. If parental consent is obtained, Early Stages conducts a professional evaluation to assess for disability and service needs. JA546-47, 581-84, 706-17, 761-73, 787-90. If services are needed, Early Stages works with the parents to develop an IEP and to enroll the child in services. JA546-47, 573-75 (mother's testimony that evaluation was held within two weeks of referral and entire process completed in two months). The District uses an electronic system to track the 120 days, allowing employees to view, in real time, data related to their open cases. JA551-52.

*Transitions from Part C to B (subclass 4)*. DCPS's preschool services under Part B begin when a child is three years old, and Early Stages and OSSE begin transition planning when a child is two. JA511, 520, 549-50, 752-60. A conference with the family is held and data from Part C is used or, as needed, additional evaluations are conducted to determine eligibility and service needs. JA511, 549-50. An IEP is developed with the family to identify the educational and related services to be provided. The goal is to complete the IEP two weeks before the child's third birthday to allow time for parents to enroll the child in the assigned school. JA549-50. For children with summer birthdays, extended school

14

year services are considered in developing the IEP. JA511, 549-50, 774-80, 1256-96 (sample IEPs).

      **b.**    **Monitoring by the Secretary of Education.**

      The Secretary of Education monitors the District's compliance with IDEA Part B as a whole, including but not limited to the child-find provisions. JA876-87, 1069-79. Since 2009, the Secretary has recognized that the District's implementation of Part B has been improving, and has removed sanctions and special conditions as progress is achieved. JA684-85, 876-87. In June 2014 and 2015, the Secretary again noted progress but designated the District as "needs intervention." JA876-87, 1069-79. The concerns the Secretary identified were not with the District's preschool child-find compliance; instead, he identified the "major factors" needing intervention as: requirements to create transitions for youth 16 years and older, timely corrections of findings of noncompliance, and timely initial evaluations and reevaluations. JA878-81, 1070-74. This last factor includes the preschool population but is not separated from students older than five years who received an initial evaluation or reevaluation. JA1049-54. The Secretary noted progress in this area, with 88.4% of initial evaluations and 90.9% of reevaluations between July 2014 and March 2015 being timely. JA1073.

      The Secretary also acknowledged the District's progress in timely implementing hearing officer determinations and transitioning children from Part C

to Part B services, noting that in fiscal year 2012, the District reported 96% of children were transitioned by their third birthday, and 98% for July 2013 through March 2014. JA885-86. The Secretary accepted these reports, "conclud[ing] that D.C. has satisfied the IDEA Part B Special Conditions" on this indicator and stating appreciation for "address[ing] [earlier] noncompliance." JA886.

### c.    Plaintiffs' analysis and the court's findings.

As noted, plaintiffs did not attempt to establish systemic violations as it had in 2011. Instead, plaintiffs' evidence and the court's findings are largely based on statistical disagreements between the parties. JA1146-48.

One of plaintiffs' witnesses was one of their attorneys, Ms. Seffel, who oversaw a case-by-case review of a random sample of cases. JA623-29. She did a secondary review of the work of paralegals. JA624-25, 672-73. She drafted the sample analysis and factual summary that was later used by plaintiffs' experts. JA426, 485, 627-29, 636, 645. She does not have a background in special education beyond this lawsuit and was not trained by plaintiffs' experts on how to conduct a review and reach conclusions on IDEA compliance. JA670-71. Plaintiffs' expert, Dr. Cupingood, admitted that he did "not know what assumptions, rules or judgments" were used in the review and that the attorney's analysis injects a level of subjectivity into the process. JA637-38. Dr. Dunst relied on the characterizations and judgments of plaintiffs' counsel without verifying

16

whether they were correct.  JA649-50.  And Ms. Seffel admitted that she did not have or follow any business rules in conducting the reviews, JA674, 1218, unlike how the District follows business rules designed to ensure consistency in its data and reporting to the Secretary, JA514-15, 585-86, 803-75, 888-913.

        i.     Subclass 1.

*Evidence*.  Without addressing the programmatic components of the District's system of identifying disabled children, plaintiffs asserted that the District is not in compliance with its identification obligations based on a statistical projection of the percentage of preschoolers that should be enrolled in special education.  JA418-506, 640, 1146-48.  Dr. Dunst put that figure at 8.5% based on his analysis in *2009* of "population-based statistics" and "risk factors associated with larger percentages of children with disabilities and delays."  JA428-29, 657-61, 1151-52.  Dr. Dunst also relied on how Dr. Beers set an aggressive internal enrollment goal of 12% based, in part, on a comparison with Atlanta and Detroit, although Dr. Beers no longer supports that aggressive goal.  JA431, 657, 686-88, 1151-54.

Dr. Dunst was asked only to render an opinion on whether or not the District achieved the numerical benchmarks set by the court in 2011, JA640, and did not repeat his work from the 2011 trial for the 2015 trial.  JA432-33.  He "attempted to obtain the same child-by-child data" to replicate the 2007 study he had relied upon,

17

but "was not able to obtain that data or reconstruct the data from the Census Bureau in the same way as was done in the 2007 report." JA432-33. Instead, he looked at public data for 2013 and earlier on risk factors in the District. JA433-34, 1151-52. He did not indicate if that data was limited to preschool-aged children.

Dr. Dunst did not look at "protective factors" that would lessen the expected percentage of preschoolers that would need special education—such as access to preventative health care, presence of social service and community organizations, and universal pre-K, JA661-65—despite acknowledging the relevance of protective factors in assessing whether children exposed to risk factors will show delays. JA665-66; *see also* JA696-99 (describing protective factors as "resources and supports"). Protective factors, Dr. Dunst admits, can "in most cases" counterbalance risk factors. JA661. "[T]hey [do] not prevent the risk," but "will buffer [children] against the negative effects of the risk factors in terms of developmental outcomes." JA661. Dr. Dunst nevertheless did not consider protective factors, testifying: "it wasn't relevant to what I was asked to do." JA665. Indeed, he was unfamiliar with the District's concentration of protective factors, JA666, which was described as "one of the most integrated social nets in the country," JA697. The "leading Early Childhood think tank" at Rutgers University ranked the District "number one in the country in terms of access to resources and also the amount of resources being invested in children." JA698.

18

Dr. Dunst also did not consider the harm to a child who is incorrectly identified as needing special education.  JA652-53.  Over-identification is a harm that can be "stigmatizing," as noted by the court.  JA699.  It can also lead to lowered expectations, JA699-700, reduced access to educational opportunities, and inappropriately restrictive environments, JA682-83.

Based on his incomplete analysis, Dr. Dunst opined that "the appropriate benchmark is still, at a minimum, 8.5 percent."  JA433-34.  He concluded that the District did not achieve 8.5% enrollment for the period after April 2011.  JA441-50.  He criticized the District's data, which showed 8.64% enrollment, JA490, for two reasons.  First, the District tracks whether a child has an IEP rather than whether all of the services in the IEP have been provided.  JA442.  He stated "*several* children … appear to have experienced a delay of four or more weeks in the start of at least *some* Part B services after receiving an initial IEP."  JA444 (emphasis added).  The children "did receive the services eventually."  JA444.

Second, the District used 2010 census data for the total population of preschool-aged children in the District rather than yearly estimated census data.  JA444-45.  For example, Dr. Dunst calculated the monthly range of enrollment in 2015 as 6.59 to 7.15% using estimated census figures, whereas the District using the 2010 census figures calculated a monthly range of 8.64 to 9.38% for the same period.  JA447.

19

Unlike at the 2011 trial, when Dr. Dunst testified that the District lacked sufficient community outreach to obtain referrals, JA436-41, he did not identify programmatic deficiencies at the 2015 trial.  Further, he admitted that he did not reevaluate whether the District implemented the programmatic recommendations in his 2011 testimony.  JA640, 644.

The Secretary of Education has not set a percentage benchmark for preschool children to be enrolled in special education, but collects such data from states, known as Child Count.   JA1042-48; 34 C.F.R. § 300.641.   Dr. Dunst concluded that in 2014, based on estimated census population, the District's Child Count is 6.19%, which is at the national average of 6.2%.  JA450, 1166-68.

*Findings.*  The court reverted to the vacated 2011 injunction, relying in part "upon the evidence presented at the last trial," and concluded that compliance for this IDEA requirement is based on a required 8.5% enrollment benchmark. JA1150-61.  The court concluded, based on the 6.19% enrollment figure, that the District is violating IDEA.  JA1168.  The injunction orders the District to enroll 8.5% of preschool children into special education and use estimated census figures in future calculations.  JA1241.  The court did not specify what the District failed to do to identify more disabled children.  JA1241.

20

ii.    Subclass 3.

*Evidence*.  Dr. Dunst opined that the District's data on timely eligibility determinations is incorrect for two reasons.  First, he believes that the District should start the 120-day "clock" from the date of referral, whereas the District begins counting from the date of parental consent.  JA452, 544-46, 718-51, 1169-70, 1230.  Dr. Dunst, however, acknowledged that the federal requirement is timed from receipt of parental consent.  JA641.  Second, Dr. Dunst believes that the District's policy on what constitutes "parental delay" for calculating performance levels "lacks common sense."  JA454.  He acknowledged that regulations direct that "the District should not be blamed for an untimely determination if the 'parent of a child repeatedly fails or refuses to produce the child for the evaluation,'" JA454 (citing 34 C.F.R. § 300.301(d)), but disputed some of the District's determinations on parental delay and decisions to close referrals when Early Stages is unable to reach the parent, JA454.  Quibbles aside, Dr. Dunst acknowledged that over two-thirds of parents are contacted within 48 hours of a case file being opened, 88% of parents are contacted within five days, and over 90% are contacted within ten days.  JA646-47.

Dr. Dunst opined that the District failed to meet the 120-day deadline after April 2011.  JA459-60.  He concluded that "the procedures being used to schedule, conduct, and complete eligibility determinations are excessively cumbersome and

21

inefficient, and this situation will never improve unless DCPS changes the manner in which referrals are processed and eligibility determinations are made," without identifying what procedures he found "excessively cumbersome and inefficient." JA459-60

The District reported that 97.06% of preschool children received a timely eligibility determination from November 2012 to December 2013. JA491. Dr. Cupingood made three adjustments to that data. His first adjustment reduced the District's figure to 93.08% by removing children transitioning from Part C to Part B, which he concluded should not be included. JA492-93, 495. His second adjustment, directed by plaintiffs' counsel, started the clock at referral regardless of parental consent, which reduced the figure to 78.16%. RD497-500. The third adjustment, which accounted for parental delays, increased the figure to 80.46%. JA500.

*Findings*. The court found that 80.46% of the eligibility determinations are timely. JA1169-72. The court concluded that the District must "start the clock" when it receives a referral regardless of parental consent and must revise its policy on parental delay "so that it uses common sense and fairness to determine when any delay should be attributed to [DCPS] and when any delay should be attributed to the parent." JA1242.

22

   iii.    Subclass 4.

*Evidence.*   The District reported that 95.54% of transitions from Part C to Part B services were timely.  JA502.  Based on the sample review of 100 cases conducted by counsel, Dr. Dunst criticized the District's data because 21 children "did not … begin to receive *all* of the services prescribed in their IEPs within 14 days of their third birthdays or, if their birthday occurred in the summer, the projected start date in the IEP," JA464-65 (emphasis added); three children did not receive a school assignment by their third birthday, JA466; and one child did not appear enrolled after receiving an IEP, JA466.

   Dr. Dunst acknowledged that "it may not be possible to start receiving all services exactly on the child's third birthday" if, for example, "the parent may choose not to start the services on that date or otherwise delay the start of services."  JA465.  Nonetheless, he concluded that compliance is measured by whether a child received all services within a flat 14-day "grace period" after the third birthday.  JA465.  Based on this definition of compliance, he concluded that about 70% of children had effective transitions.  JA467.

   Dr. Dunst speculated that the reason for "delays" is because the District conducted too many evaluations for children transitioning from Part C to Part B. JA471 (noting 95% of children have some evaluations completed).  "These

23

additional evaluations are most likely resulting in additional delay … and the District is also likely using resources to conduct unnecessary evaluations." JA472.

Dr. Dunst also criticized the District's extended school year services. JA467-70. He reported that IEPs for children with late-spring or summer birthdays were frequently implemented in the next school year. JA468. Based on a review of part of the files, he guessed "there is a good chance that [the children] are not even given any consideration for [extended school year] services." JA469. He speculated that children "*may* be denied appropriate consideration for Extended School Year Services" and "these children *may* have been denied the summer services." JA468-70 (emphases added).

Dr. Cupingood similarly adjusted the District-reported performance of 95.54% for 2012-2013 by excluding two children who plaintiffs' counsel believed were not eligible for transition; and reporting that 24 of the remaining 98 children in the sample had untimely transitions.[1] JA502-04. Plaintiffs' counsel explained why they deemed the 24 transitions untimely: "[I]f a child did not receive all of his or her related services within 14 days, we counted that child untimely because they didn't receive every single service." JA676-77. With his adjusted figures, Dr.

---

[1] It is unclear why Drs. Cupingood and Dunst have different numbers for the same sample of 100 children. The court used both sets of numbers without noting the inconsistencies. JA1176, 1184-85.

24

Cupingood determined that 71.6% of children had timely transitions from Part C to Part B.  JA504.

*Findings.*  The court concluded that "almost 30 percent of children are not receiving smooth and effective transitions."  JA1176, 1185.  The court set a standard for implementation of an IEP, stating that all services must be provided within 14 days of the child's third birthday or within 14 days of the first day of school if the child's birthday is in the summer and she is not eligible for extended school year.  JA1243-44.  The court also found that the District did not comply with its policy on extended school year because, as explained by Dr. Dunst, the files did not "include evidence that the child's eligibility for [extended school year] was properly evaluated."  JA1189.  The injunction requires 95% of children will have a smooth and effective transition, as defined by the court rather than IDEA. JA1243-44.

## STANDARD OF REVIEW

The Court considers mootness *de novo*, *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009), and "class certification orders for abuse of discretion.  Abuse of discretion results when a district court commits legal error or makes clearly erroneous factual findings."  *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015). Decisions to issue injunctions are reviewed for legal error and abuse of discretion.

25

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1110 (D.C. Cir. 2009). Legal conclusions and statutory interpretation are reviewed *de novo*. *Id*.

## SUMMARY OF ARGUMENT

The district court made three fundamental legal errors: (1) it should have dismissed the case because the named plaintiffs' claims were undisputedly moot when they sought certification; (2) it should not have certified subclasses that lacked commonality and otherwise did not satisfy Rule 23; and (3) it should not have ordered broad systemic relief not permitted by IDEA based on findings and conclusions that are contrary to the law. This Court can correct these legal errors by vacating the class certification, liability, and remedial orders and ordering the case dismissed as moot.

1. The district court should not have proceeded with a moot case when plaintiffs' counsel had every opportunity to substitute the named plaintiffs for children with live claims but did not. Plaintiffs have never disputed that their claims were moot when they sought certification in 2013. Instead, they persuaded the court that the request for certification related back eight years to the original complaint. While there is a narrow exception to the mootness doctrine that allows a court to relate back to the time when certification is sought when a claim is "so inherently transitory" that the court otherwise would not have time to rule on certification before the named plaintiffs' claims expire, that does not apply here

because plaintiffs' claims are not transitory and, in any event, they had already expired when they sought certification in 2013.

2. Assuming jurisdiction, class certification cannot stand. Plaintiffs bore the burden to show that the subclasses satisfied Rule 23(a) and (b), and the district court bore the burden to undertake a "rigorous analysis" before certifying the classes. They did not satisfy these burdens.

a. The plainest error was a failure to show commonality under Rule 23(a)(2). There is no "common contention" within any subclass that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Just like the original class vacated by this Court, the subclasses allege a variety of child-by-child operational failures concerning numerous aspects of the District's management of its special-education functions. Plaintiffs' formal division of the invalid class into four subclasses defined by various IDEA subsections does not alter the fundamental problem this Court found in 2013.

b. Further, the named plaintiffs, born between 1998 and 2002, are not typical of the preschoolers allegedly not being found, determined eligible, or transitioned today, especially given significant and undisputed programmatic changes over the last decade. And, because their claims were moot, the named

27

plaintiffs are not adequate representatives of any subclass. And no "indivisible" injunction or declaratory judgment can provide relief to each class member.

3. IDEA does not authorize the relief issued here. IDEA provides individual relief through its procedural safeguards for parents and systemic relief through the Secretary of Education's administrative oversight. It is not appropriate under IDEA to impose a structural injunction and declaratory relief based on statistical projections of how the system as a whole should be performing rather than identified programmatic failures affecting specific children. Moreover, the structural relief here is not supported by specific findings and is not narrowly tailored. Indeed, the findings are based on misstatements of the law and disputes about data calculations. To the extent there are violations of IDEA, such minor and procedural violations do not support intrusive structural relief.

## ARGUMENT

### I. The District Court Lacked Jurisdiction To Certify The Class Because The Named Plaintiffs Had No Legally Cognizable Interest In The Case When They Moved For Certification.

An "Article III court must be sure of its own jurisdiction before getting to the merits." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999). "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 133 S. Ct.

28

721, 726-27 (2013) (internal quotation marks omitted).    Because the named plaintiffs' claims undisputedly were moot when they sought certification, the Court should vacate all the rulings below not already vacated in the first appeal, and order dismissal.

### A.    A court cannot certify a class if the named plaintiffs' claims are moot when they seek certification.

The Supreme Court addressed mootness in the class context in *Sosna v. Iowa*, 419 U.S. 393 (1975).    There, when the class was certified, the named plaintiff had a live claim, but on appeal her claim became moot.    *Id*. at 398-99. Had the plaintiff brought an individual action, the mootness of her claim would have resulted in dismissal, but the Court held that the action survived because, through certification, the class gained "a legal status separate from the interest asserted by [named plaintiff]."    *Id.* at 399; *see Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1530 (2013).

The common-sense premise underlying *Sosna* is that the class must be certified *before* the named plaintiffs' claims become moot—otherwise the class would never attain that separate "legal status."    419 U.S. at 399.    Until a class is certified, only the named plaintiffs have legal status and each must satisfy the case-or-controversy requirement.    After all, "until certification[,] there is no class action but merely the prospect of one."    *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002).    If a named plaintiff's claim becomes moot, he can no

longer proceed with his individual claim, nor can he seek class certification because the named plaintiff "must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna*, 419 U.S. at 403.

Here, it is undisputed that named plaintiffs' claims were moot years before they sought certification of the four subclasses. RD365 (motion to dismiss); RD369 (opposition). Accordingly, they could not maintain their individual claims, and they were not members of the subclasses they purported to represent. The court should have declined certification in the absence of any named plaintiff with a viable claim, and dismissed the case.

## B. No exception to the mootness doctrine allowed these named plaintiffs to seek certification.

In *Sosna*, the Court suggested that "[t]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the court can reasonably be expected to rule on a certification motion." 419 U.S. at 402 n.11. In that circumstance, it might be appropriate to exercise jurisdiction lest the claim "evade review." *Id*. The Court explained in later cases that this exception is limited to "inherently transitory" claims. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980). The exception "was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff

possessed a personal stake in the suit long enough for litigation to run its course …. [and it] has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim." *Genesis Healthcare*, 133 S. Ct. at 1525-26. This exception, however, is narrow and does not permit a court to address a certification motion that was filed *after* the plaintiffs lost their personal stake in the case. This is so for two basic reasons.

First, to take advantage of the exception, the named plaintiff must have a live claim when the certification motion is filed. That is why *Sosna* speaks of the time when "the court can reasonably be expected to rule" on the motion, not the time when a party can reasonably be expected to file it. 419 U.S. at 402 n.11.

Indeed, the Supreme Court has acknowledged that for the narrow class of "inherently transitory" claims, the relation-back approach allows a court to pass on a jurisdictional defect in a named plaintiff's claim by relating back the certification issue to the time when the plaintiff sought certification and his claim was live. *Id.*; *Geraghty*, 445 U.S. at 404 n.11. But if the plaintiff does not have a live claim at the time he seeks certification, there is nothing to relate back to. Were it otherwise, the mootness exception would consume the rule.

Thus, in *Lusardi v. Xerox Corp.*, 975 F.2d 964 (3d Cir. 1992), the Third Circuit explained that *Geraghty* "made clear that the named plaintiff's attempt to represent the class was justifiable only because, at the time he moved for class

31

certification, he possessed an interest in the outcome of the case." *Id.* at 976.  It was aware of "no opinion [allowing] a district court to exercise jurisdiction over a class certification motion filed by a named plaintiff lacking a live claim at the time the motion is filed." *Id.*  It accordingly affirmed dismissal of a case where the named plaintiff could not demonstrate the existence of "a live individual claim when the district court [would have] decide[d] the class certification issue, or, at the very least … when he filed for class certification." *Id.* at 977.

This case is no different.  The named plaintiffs sought certification *after* their claims were moot and, as such, they lacked the requisite "personal stake" in the certification issue to invoke the "relation-back" principle under *Geraghty*.

Second, to proceed on their claim, plaintiffs had to show that the "controversy … is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion."  *Sosna*, 419 U.S. at 402 n.11; *see Genesis Healthcare*, 133 S. Ct. at 1526; *Cty. of Riverside*, 500 U.S. at 52.  But each of the named plaintiffs had a live claim for a lengthy period of time—while he or she was between the ages of three and five (or longer if they were owed compensatory education and/or reimbursement).  *See* 20 U.S.C. § 1412(a)(1)(A).  Unlike pretrial detainees whose detention could have elapsed within hours, *Gerstein v. Pugh*, 420 U.S. 103, 110-11 n.11 (1975), the individual interests of the named plaintiffs—indeed, the individual interests of all potential

32

plaintiffs—existed for years. They thus cannot take advantage of the "inherently transitory" exception.

Indeed, because all potential plaintiffs' claims were viable for years, class counsel could have sought to add named plaintiffs with viable claims when they amended their complaint in 2013 after this Court's vacatur of the 2006 certification decision. *See Culver v. City of Milwaukee*, 277 F.3d 908, 910, 912-13 (7th Cir. 2002) ("[T]he lawyer for the class should have lined up another class member to take [named plaintiff's] place as class representative in the event that we ordered the class recertified."). Plaintiffs' claims were moot long before they moved to certify the subclasses, and the failure of counsel to find plaintiffs with live claims who were actually members of the subclasses when they sought certification doomed this action after remand from this Court.

For these reasons, the district court erred in applying the "inherently transitory" exception. The court found that IDEA cases are "ponderous," but the exception is meant to address the exact opposite: claims of an inherently "fleeting nature." *Genesis Healthcare*, 133 S. Ct. at 1525-26. It also found that the "lengthy and peculiar circumstances" of the case "warrant[ed] relation back of the subclass certification." JA314-15. But the district court cited no authority excepting IDEA cases from the mootness doctrine. Moreover, its proposed exception to fundamental mootness principles for "lengthy and peculiar circumstances"

33

suggests no meaningful limiting principle.  Jurisdictional rules should be clear and readily administrable, and should honor Article III's choice to focus federal courts on live cases and controversies.  *See Exch. Nat'l Bank of Chi. v. Daniels*, 763 F.2d 286, 293 (7th Cir. 1985) ("This rule has the virtues of generality and certainty, which a good jurisdictional rule should.").

The only "peculiar" thing about this case was counsel's decision to proceed with moot claims instead of substituting plaintiffs with live claims.  *See Culver*, 277 F.3d at 910; *see also Lusardi*, 975 F.2d at 983 (finding "eight years and two failed attempts to certify a class" as evidence that "this simply was not a case where the trial court lacked a reasonable opportunity to rule on the merits of class certification").  If the District's child-find program were as deficient as plaintiffs alleged and the court found, surely plaintiffs' counsel could have found a handful of new plaintiffs to act as representatives of their purported subclasses.  In light of the absence of any plaintiff with a live claim, the court should have dismissed this case, leaving any child with a live claim from an alleged violation of the child-find provisions fully able to seek relief in a new action properly within the court's jurisdiction.

## II.     Class Certification Was Improper Under Rule 23.

Even assuming the court had jurisdiction to consider class certification, vacatur of the liability and relief rulings is independently warranted by the legal

errors in the certification ruling. And because the named plaintiffs lack any live claims, vacatur of the certification also requires dismissal.

### A.    The subclasses do not satisfy Rule 23(a)(2).

A "class action is an awkward device," *Culver*, 277 F.3d at 910, that is "an exception to usual litigation conducted by and on behalf of the individual named parties only," *Wal-Mart*, 564 U.S. at 348. "Class certification is far from automatic." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249 (D.C. Cir. 2013). "A district court's ruling on the certification issue is often the most significant decision rendered in these class-action proceedings." *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980). Strict adherence to Rule 23 ensures the exception is used in appropriate cases. "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Named plaintiffs "must affirmatively demonstrate compliance with the Rule." *Id*. at 350-52; *see also Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart*, 564 U.S. at 350-51 (internal quotation marks omitted).

Rule 23(a)(2) requires a "common contention" that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." *Id*. at 350.  This Court—applying the principles from *Wal-Mart*—vacated the original class in this case, which was defined by allegations that all members suffered from a violation of IDEA.  *DL*, 713 F.3d at 126-28.  On remand, however, the district court recertified essentially the same class—now formally divided into subclasses, but without meaningful difference.  JA287-319.  This Court's decision was not, however, based on mere technicalities.  The district court's justification for sidestepping the decision does not withstand scrutiny.

First, the court erroneously concluded that defining each subclass based on provisions of IDEA solved the "broadness problem" presented by the vacated class.  JA299-300.  The court reasoned that each "subclass poses the question whether the District's policies were adequate to fulfill a specific statutory obligation under the IDEA."  JA300.  But it is not enough to say that class members "have all suffered a violation of the same provision of law."  *Wal-Mart*, 564 U.S. at 350.  The bottom-line liability question is not a proper common contention that can be resolved in one stroke.  *DL*, 713 F.3d at 128.

This Court thus specified that defining a class based on a violation of a provision of law rather than on specific policies or practices common to all members does not satisfy the "one stroke requirement."  *Id.* at 127.  At least after remand from this Court, plaintiffs' counsel could have attempted to propose

36

classes based on specific policies or practices, but they did not.  That failure means that the certified subclasses are invalid under the rulings of the Supreme Court and this Court.

Second, the district court erroneously concluded that factual differences between this matter and *Wal-Mart* "underscore the commonality in the proposed subclasses."    JA300.    The court found significant that *Wal-Mart* involved "amorphous" Title VII employment obligations and over 3,000 stores, whereas IDEA obligations are "objective" and primarily involve two agencies within the District.   JA300.   Those differences are immaterial, as this Court apparently recognized in vacating the earlier class certification in this case.  *Wal-Mart* (and now *DL*) establish the proper legal interpretation of Rule 23(a) to apply to different factual contexts.

Moreover, obligations to make gender-neutral employment decisions under Title VII are no more amorphous than IDEA's obligations to identify, locate, evaluate, determine eligibility, and offer services to hundreds of disabled preschool children based on individual assessments and professional judgment.  Indeed, "identifying disabled students who might be eligible for special-education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria," and so the Seventh Circuit has applied *Wal-Mart* to vacate a class certification in a child-find case.  *Jamie S. v. Milwaukee*

37

*Pub. Sch.*, 668 F.3d 481, 496 (7th Cir. 2012); *see also Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980) ("[I]dentifying learning disabled children is a gargantuan task."). The complexity of this system is comparable to that of the employment system in *Wal-Mart*.

The court here made the same error reversed by the Fifth Circuit in *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), a class action challenging alleged systemic problems with the Texas child welfare system, where the supposed common contention defining the class relied on "the alleged shortcomings of the … system." *Id.* at 838. Despite the fact that each member may "experience[] the alleged shortcomings … in a different way," the district court found commonality because all members are "within the same system and subject to the alleged deficiencies in that system." *Id.* at 838-39. This ruling was overturned as contrary to *Wal-Mart* because "the members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant." *Id.* at 840. The analysis must focus on the "dissimilarities among the proposed class members 'in order to determine whether there is even a single common question.'" *Id.* at 841. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350.

Failing to conduct the requisite rigorous analysis, the court here similarly failed to appreciate the dissimilarities among the claims in each class. Because no common policy or practice has been specified, there is no reason to think, for instance, that all failures to "identify" eligible preschoolers share anything meaningful in common besides the bottom-line conclusion that these children were not identified. For each class, the failure to propose anything more in common than an alleged violation of a provision of law precludes a finding of commonality:

*Subclass 1* is defined by its underlying conclusion—a disabled preschool child was not identified. But Rule 23 demands more. There are many different reasons why a child with a disability might not be identified. For example, one child might not be identified because the District conducted insufficient outreach with her private daycare or another child with a mild disability because no one suspected her disability.

*Subclass 3* members share a bottom-line conclusion that an eligibility determination was untimely. But the reasons for an untimely determination will vary from child-to-child. For example, one child might have a delayed determination because of documentation errors and another child because there is insufficient staff to complete a timely determination.

*Subclass 4* is the broadest of the classes. Simply concluding that a toddler who participated in Part C did not have a smooth transition to Part B by her third

39

birthday does not provide a common contention—again, it is simply a common bottom-line conclusion. The reasons children might not have a smooth transition vary dramatically; indeed, the subclass definition itself betrays diversity of the claims, listing four different sub-requirements for a transition to be considered "smooth and effective." JA311. Even within each sub-requirement, there will be varying reasons for the lack of a smooth transition—for example, because a parent delayed in enrolling the child in the assigned school or because Part B staff missed the IEP meeting because of a scheduling miscommunication.

The "truth or falsity" of the diverse contentions of class members will not "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. To the contrary, as the Seventh Circuit reasoned in *Jamie S.*, IDEA's child-find requirements are "necessarily child specific" because "[t]here is no such thing as a 'systemic' failure to find and refer individual disabled children for IEP evaluation—except perhaps if there was 'significant proof' that [the agency] operated under child-find *policies* that violated the IDEA." 668 F.3d at 498. "[A]n illegal *policy* might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class." *Id*. That critical glue is missing here, because plaintiffs' counsel declined to take this Court's guidance that they should identify "a policy or practice that links the class as a whole." *DL*, 713 F.3d at 129.

40

To be sure, the reasons for the injury do not have to be identical, but *Wal-Mart* said that "[w]ithout some glue holding the alleged *reasons* for [the challenged decisions] together," examination of all the class members' claims could not "produce a common answer to the crucial question *why was I disfavored*." 564 U.S. at 352. Each subclass is designed not around the crucial question *why* any member was disfavored but instead the inappropriate question *whether* any member was disfavored. Unlike the answer to the question the Supreme Court identified, the answer to the question the court and plaintiffs' counsel chose is not "apt to drive the resolution of the litigation." *Id.* at 350; *Jamie S.*, 668 F.3d at 498; *Adashunas*, 626 F.2d at 604 ("[S]ince the proposed class is so amorphous and diverse, it cannot be reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief."). Thus, like the original, vacated class, the subclasses here cannot stand.

### B.   The classes also do not satisfy the typicality and adequacy-of-representation requirements of Rule 23(a) or the "indivisible" injunction requirement of Rule 23(b)(2).

"The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). The court found typicality based on the same error it made in finding commonality, by ignoring the variation in claims and finding the bottom-line conclusion sufficient. JA302-03. But where

claims vary from child-to-child, the claims are atypical and certification must be rejected. *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (rejecting a class defined by a bottom-line conclusion); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).

Similarly, it was not established that named plaintiffs can be adequate representatives under Rule 23(b)(4).  When a plaintiff's claim is moot, it makes her representation presumptively inadequate because she does not have an interest in the relief sought (which also means that she is not typical, because she is not a member of the class).  *Culver*, 277 F.3d at 912; *see Geraghty*, 445 U.S. at 405-07; *Sosna*, 419 U.S. at 403.  The court erred by disregarding this presumption.  The court's attempt to distinguish *Culver* by stating that named plaintiffs "have displayed a strong commitment to resolving this case, responding to all developments in a timely and professional fashion," JA305, does not address the undeniable fact that they are not members of the subclasses they seek to represent and do not have an interest in the relief sought.

The class also fails under Rule 23(b)(2).  "The key to the (b)(2) class" is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart*, 564 U.S. at 360.  A (b)(2) class may be certified "only when a single injunction or declaratory judgment

42

would provide relief to each member of the class." *Id.* The variations in claims on identification, eligibility determinations, and transitions mean that there is no one-size-fits-all injunction that would serve members of each subclass. For example, if a child does not receive a timely eligibility determination because of insufficient staff, then hiring more staff would resolve the problem for her but would have no impact on the child who does not receive a timely determination because his parent cannot be located or refuses to participate. Proof of the complex nature of the relief is the court's sweeping structural remedy, with broad programmatic and numerical requirements. None of these requirements resolve the claims of any subclass "in one stroke." *Wal-Mart*, 564 U.S. at 350.

### III. The Law And The District Court's Findings Do Not Support The Structural Injunction And Declaratory Relief.

#### A. The findings of noncompliance are based on underlying legal rulings contrary to IDEA's plain language.

The decision to order a structural injunction and declaratory relief here did not comply with longstanding principles that such relief must be based firmly in law, with specific findings of systemic violations, and narrowly tailored to remedy those specific violations. *Cobell v. Norton*, 428 F.3d 1070, 1074 (D.C. Cir. 2005) ("[A]ny injunction issued by the district court must be grounded … in … 'specific findings….'"); *Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the

43

inadequacy that produced the injury in fact that the plaintiff has established."); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." (internal quotation marks omitted)).

In addition, the court here had to "bear in mind that [the] end purpose is not only to remedy the violation to the extent practicable, but also to restore state and local authorities to the control of a school system that is operating in compliance with the [law]." *Missouri v. Jenkins*, 515 U.S. 70, 102 (1995) (internal quotation marks omitted). "[I]nstitutional reform injunctions often raise sensitive federalism concerns," especially in "areas of core state responsibility, such as public education," because "[they] bind state and local officials to the policy preferences of their predecessors." *Horne v. Flores*, 557 U.S. 433, 448-49 (2009).

The district court did not adhere to these principles when it broadly ordered the District to overhaul its implementation of IDEA's child-find requirements. The program functions well, and the court could find otherwise based only on dubious statistics—generated by plaintiffs' attorney and uncritically accepted by plaintiffs' experts, JA623-29, 636-38, 645, 649-50—rather than evidence of specific programmatic violations of IDEA, JA1147-48, 1186, 1216. Moreover, even taken at face value, the statistical evidence did not show violations under a proper

44

understanding of the law. The injunction imposes requirements not found in IDEA and improperly intrudes on local educational programs. The injunction and the related declaratory relief should be vacated as to each subclass.

*Subclass 1*. The court's reliance on statistics to find a violation of IDEA's requirement to identify and locate disabled children, 20 U.S.C. § 1412(a)(3), was error for multiple reasons. JA1150-68. First, the compliance benchmark set by the court—8.5%—is not from IDEA or its regulations. *See* 20 U.S.C. § 1412. Nor is it from the Secretary of Education. JA651-52.

Second, the court relied on the analysis and opinion of an expert to create the 8.5% benchmark, but the expert's analysis was admittedly incomplete. JA428-33, 640, 651-53, 661-66. Dr. Dunst was not asked by counsel for plaintiffs to look at protective factors despite admitting they would "buffer [children] against the negative effects of the risk factors in terms of developmental outcomes." JA661. The court's conclusion that those factors are "baked into" his analysis is plainly erroneous based on Dr. Dunst's own testimony that he did not consider them. JA661-66, 1157.

Third, the compliance percentage itself is based on enrollment, not identification. Enrollment data represents only a subset of the children the District identified and located. JA668-69, 692-93. Dr. Dunst explained that there are instances where an identified child is not enrolled: "*there would be situations*

45

*where the parent decided they didn't want the service*, there could be a whole variety of reasons." JA657 (emphasis added).

The district court acknowledged that enrollment is not the IDEA requirement and recognized that the 8.5% benchmark "is by its very nature an estimate, and is not perfect." JA1159-61. The court nonetheless strictly applied this imperfect estimate to conclude that the District is violating IDEA and entered an injunction transforming the estimate into a mandate legally enforceable through court oversight and threat of contempt. JA1168, 1225-27, 1241. This was improper, especially since it was plaintiffs who bore the burden to show a violation and where the court, if anything, should have erred on the side of leaving control of the school system to state and local authorities. *See Jenkins*, 515 U.S. at 102.

Fourth, even as to enrollment, the court's reliance on Dr. Dunst's testimony was error. Dr. Dunst believed that the District was wrong to count a child as enrolled if not *all* of the services under the IEP had been provided. JA444. He noted that "several children" had a delay "in the start of at least *some* Part B services after receiving an initial IEP." JA444 (emphasis added). But plainly, if a child has an IEP and has been receiving some services, any failure is not one of identification or location.

The court notably did not make factual findings related to the District's program or procedures for identifying children. The evidence shows that the

46

District's procedures for *identifying* disabled children are in fact more than adequate under IDEA. The Third Circuit has found a school district's identification efforts "appropriate" when "it routinely posts child find notices in the local paper, makes the information available on its website, … sends residents the information in their tax bills," and "[t]argeted posters and pamphlets are placed in private schools." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009). The District does significantly more.

*Subclass 3*. The court's finding that the District violated the requirement for timely eligibility determinations, 20 U.S.C. § 1412(a)(3), was also based on statistics rather than on programmatic deficiencies, and further on three adjustments plaintiffs' counsel made to the District's data. The most significant of those adjustments—reducing the District's figures by 15%—was to "start the clock" when a child was referred to Early Stages for an evaluation regardless of whether the parent consented to an evaluation. JA492, 495. This adjustment is contrary to the plain language of IDEA. It mandates that eligibility determinations are made "within 60 days *of receiving parental consent* for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted, within such timeframe." 20 U.S.C. § 1414(a)(1)(C)(i) (emphasis added). District law provides 120 days rather than 60 but does not alter the parental-consent requirement, nor could it. D.C. Code § 38-2561.02(a); *see, e.g.*, *Hutchins v.*

47

*District of Columbia*, 188 F.3d 531, 549 (D.C. Cir. 1999) (discussing a parent's right to make decisions about his or her child to include educational decisions).

The District duly calculates its performance from the date of parental consent—consistent with IDEA—and its policies and procedures account for this requirement. JA544-46, 1169-70, 1230. The court rejected the District's argument that parental consent is needed to "start the clock," finding: "the actual start of the clock would not negatively affect parents. If anything, it helps ensure that the child timely receives services. The only advantage the Court sees of not starting the clock is to give the District additional time for an eligibility determination." JA1170. This ruling is contrary to the plain language of IDEA and ignores longstanding legal authority that parents have the right to control the education of their children. The court's finding that 20% of children are not receiving timely determinations is based largely on that legal error. JA1169.

*Subclass 4*. The court also used an incorrect legal standard in finding that the District violated the requirement to have a smooth and effective transition from Part C to Part B, per 20 U.S.C. § 1412(a)(9). The court created a standard that requires *all* special education services to begin by the child's third birthday (or the next school day if the birthday is on a weekend or holiday) and that *all* related services be provided within 14 days after the child's third birthday. JA1243-44. If the child has a summer birthday and does not qualify for extended school year,

48

then *all* related services must begin within 14 days of the first day of school. JA1180-84, 1243-44. This inflexible standard is contrary to IDEA and may improperly override the child-specific IEP developed and approved by a team that includes parents and education professionals.

IDEA states that a Part C to Part B transition is smooth and effective when, by the child's third birthday, an IEP "has been developed and is being implemented for the child." 20 U.S.C. § 1412(a)(9). Associated regulations require that an IEP be "developed and … implemented for the child consistent with § 300.101(b)." 34 C.F.R. § 300.124(b). Section 300.101(b) is the requirement for "FAPE for children beginning at age 3." It obligates states to "make FAPE available" to eligible children by their third birthday and requires the IEP to be "in effect for the child by that date, in accordance with § 300.323(b)." *Id.* § 300.101(b). Subsection 300.323(b) describes the procedures for using an Individual Family Service Plan as an IEP for preschool children. *Id.* § 300.323(b). Subsection 323(c) then provides: "As soon as possible following development of the IEP, special education and related services are [to be] made available to the child in accordance with the child's IEP." *Id.* § 300.323(c).

The district court rejected the District's argument that the standard for implementing the IEP is "as soon as possible," stating that § 300.323 does not apply to transitioning children. JA1180. But the court failed to acknowledge that

49

the provisions that apply to transitioning children cross-reference § 300.323, the provision entitled "When IEPs must be in effect."   By its own terms, then, § 300.323 applies to children who receive an initial IEP when they transition from Part C to Part B, requiring implementation "as soon as possible" rather than within any specific timeframe.   And that makes sense, given that each child's circumstances are unique.  For example, a parent might delay services for his child who turns three in the spring so that she may begin preschool in the fall term with her peers.

      The court's ruling is contrary not only to the plain language of the regulation, but also to case law.  *See D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503 (2d Cir. 2006).   There, the Second Circuit rejected a standard that required implementation of an IEP "immediately, or at least 30 days, after" development as inconsistent with the regulation.   *Id.* at 512-14.   The court discussed the Secretary's prior consideration—and rejection—of specific timelines in favor of the "as soon as possible" language, which the court noted was "by design, a flexible requirement."  *Id.* at 514.  The district court should have reached the same conclusion here.

      The court also failed to address the individual nature of each IEP, which should contain the "*projected* date for the beginning of the services … and the *anticipated* frequency, location, and duration of those services" after the IEP is

50

developed and approved by the team that includes parents and education professionals.  20 U.S.C. § 1414(d)(1)(A)(i)(VII), (B) (emphases added).  IDEA presumes an individualized approach to educational services—that is why it requires an *individualized education program*.  *Id.* § 1414.  The IEP may include, as needed: (1) special education services, (2) related services, and (3) supplementary aids and services.  *Id.* § 1414(d)(1)(A)(i)(IV).  Related services (e.g., psychological services, physical and occupational therapy) are not necessarily provided daily but provided pursuant to a schedule built into the IEP itself.  *See id.* §§ 1401(26), 1414(d)(1)(A)(i)(VII); *see also* JA1256-96 (examples of IEPs which provide related services as a monthly requirement).

The district court's compliance standard that the services in the IEP must be provided by a child's third birthday rather than the start date in the IEP nullifies the decisions made by the child's parents and professionals and memorialized in the IEP.  Deference, however, generally should be given to special educators' decision-making in the IDEA context.  *MM ex rel. DM*, 303 F.3d 523, 532 (4th Cir. 2002).

The District satisfies the requirement in 20 U.S.C. § 1412(a)(9) for a smooth and effective transition with evidence that the IEP was developed and that it "made available" the services prescribed therein by providing an assigned placement.  The contrary position—requiring delivery of all services in the IEP on or within two

51

weeks of the child's third birthday—again obligates the District to meet a standard that is not supported by IDEA or its regulations. The injunction was improper as to this subclass, just as to the others.

There is, finally, no merit to the court's overarching reasons for rejecting the District's argument that a structural injunction is unjustified because plaintiffs failed to show a systemic violation and instead demonstrated, at most, some claims for individual children which should be remedied through a due process complaint and the administrative procedures set out in IDEA. JA1238. The court concluded that an injunction is appropriate because "violations [of IDEA] affect at least hundreds of children annually," and, in balancing the "hardships," an injunction that "require[s] the District to do nothing more than comply with its legal obligations cannot, by definition, harm it." JA1238-39.

Neither reason is supported by this record or legal authority. First, as explained, because of legal errors, the court incorrectly concluded that a large number of children were affected by the "violations" of IDEA when they were not. Second, the injunction is not merely ordering the District to comply with the law. The injunction includes requirements not in IDEA, like the enrollment of 8.5% of preschool children in special education, a timing analysis that disregards parental consent, and a two-week mandate for service delivery in transitioning from Part C to Part B without regard to the child's IEP. JA1241-44. None of these

52

requirements are from IDEA and thus the court was not merely ordering compliance with the law.

Moreover, even if the injunction was merely ordering compliance with the law, such an order is overly broad and should be struck:

> [T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged.

*N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941); *see Cobell*, 392 F.3d at 475 (rejecting injunction that "amounts to an order to obey the law" because it "would be subject to contempt charges for every legal failing, rather than simply to the civil remedies provided in [that law]").

The court's reliance on *Cordero by Bates v. Pennsylvania Department of Education*, 795 F. Supp. 1352 (M.D. Pa. 1992), to justify an injunction is misplaced because the IDEA provisions at issue there differ significantly from this case. The students there already had IEPs, but the services they needed were not provided because of a lack of placements statewide. *Id.* at 1357. The court also had specific evidence of systemic failings and effect on the children; for example, the court found "the lack of monitoring to address situations where an individual or groups of individuals have been waiting excessive periods for an appropriate placement." *Id.* at 1362-63. The court deemed the procedural protections in IDEA

53

ineffective because the students "have already been found to require a type of placement currently not available and thus have remained in limbo." *Id.* at 1362. No similar findings were made here. In fact, the evidence here shows the opposite: plaintiffs who engaged in the administrative protections under IDEA resolved their claims, RD465-1, and the only testimony from a parent in this matter detailed her "amazing experience" with the "professional" staff at Early Stages, who gave "thorough explanations" and completed the evaluation and enrollment process for her son within two months. JA573-74.

    **B.**    **Structural relief based on supposed statistical deficiencies rather than the identification of inadequate policies or practices is contrary to IDEA.**

IDEA provides two mechanisms for relief. The first provides individual relief and the second systemic relief. Neither permits the structural injunction and associated declaratory relief issued by the district court.

Section 1415 is titled "Procedural safeguards" and, consistent with its title, a parent may file a complaint to be heard through an administrative due process hearing. 20 U.S.C. § 1415(f)(1)(A). "Any party aggrieved by the findings and decision" from such a hearing has the right to bring a civil action, and then only "with respect to the complaint" filed in those individualized administrative proceedings. 20 U.S.C. § 1415(i)(2)(A). Section 1415 allows a court to "grant such relief as [it] determines is appropriate," *id*. § 1415(i)(2)(C), with "broad

54

discretion" to issue "appropriate" injunctive relief in order to meet each child's "unique needs," *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). Section 1415 does not set forth standards of compliance for a court to apply when considering systemic relief.

The second mechanism addresses systemic reform, similar to what is sought here, but IDEA provides for such reform through non-judicial means: the Secretary's oversight power and, if necessary, defunding or corrective actions of underperforming systems. 20 U.S.C. § 1416. Indeed, the Secretary has been involved in reform of the District's child-find system. For example, the Secretary's oversight over smooth and effective transitions from Part C to Part B, which included specific conditions on the District, were removed in 2014 because compliance was achieved. JA876-87.

Reading these provisions together, the proper role of Section 1415 is individualized rather than systemic relief. Even assuming an injunction might be available if, for instance, a plaintiff challenges a discrete policy or practice, it is not appropriate under IDEA to impose an injunction—particularly one as sweeping as here—based on statistical projections of how the system as a whole should be performing rather than identified programmatic failures affecting specific children. Congress would not have meant to empower federal courts to assume control of local school systems based on statistical assessments that they are underperforming

55

marginally without including performance standards in IDEA for the courts to enforce.

The court here strayed impermissibly from the focus on individual relief that is the heart of Section 1415. The subclasses include not only those who "will not" be identified or located, or "will not" receive a timely evaluation or a smooth and effective transition from Part C to Part B, but those who "were not" identified or located, or "did not" receive a timely evaluation or a smooth and effective transition. JA285-86. There is no way this injunction will address the "unique needs," *Burlington*, 471 U.S. at 369, of those who, for instance, were not found until after they were five years old but have since received IEPs and compensatory education for any delay in providing services.

Recognizing that the structural relief the court ordered was improper under Section 1415 is particularly important here because the conditions that govern states' participation in IDEA, as Spending Clause legislation, "must be set out 'unambiguously.'" *Murphy*, 548 U.S. at 296. "Legislation enacted pursuant to the spending power is much in the nature of a contract, and therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly." *Id*. (internal quotation marks omitted). Section 1415(i)(2) cannot be interpreted to provide a remedy of which it fails to furnish clear notice to state education officials. *Id*. The intergovernmental administrative

56

mechanism under Section 1416—not this judicial one—comports with Congress's

design.[2]

### C. Procedural violations alone do not demonstrate a failure to provide FAPE.

Furthermore, the generalized and procedural nature of the findings does not

support the conclusion that children were denied FAPE.  JA1221-25.  A failure

under IDEA will "constitute a denial of a [FAPE] only if it result[s] in loss of

educational opportunity for the student." *Leggett v. District of Columbia*, 793 F.3d

59, 67 (D.C. Cir. 2015) (internal quotation marks omitted).  "IDEA operates from

the premise that each child will have unique disabilities and presumes that each

program will be personalized." *Blackman v. District of Columbia*, 633 F.3d 1088,

1094 (D.C. Cir. 2011).  IDEA is a statute that rejects bright lines and a "cookie-

cutter approach." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 523-25

(D.C. Cir. 2005).

The court acknowledged that procedural violations alone are insufficient to

find a denial of FAPE, JA1224-25, but then contradicted itself by finding a denial

of FAPE based on generalized procedural findings, JA1224-25.  The court's cited

---

[2]      That this is a class action is irrelevant.  "[T]he Rules Enabling Act forbids
interpreting Rule 23 to 'abridge, enlarge or modify any substantive right'…." *Wal-
Mart*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)).  If no single individual may
seek this type of relief under Section 1415 based on the type of evidence presented
here, it does not matter how many individuals are encompassed within the class.

authority does not support its conclusion. JA1220-22. In *N.G. v. District of Columbia*, 556 F. Supp. 2d 11 (D.D.C. 2008), the court found a denial of FAPE based on the individual and specific facts of that case, not based on generalized statistics. There, the child was not identified and located by DCPS despite showing signs in school of an emotional disability, and there was evidence that the failure to identify and evaluate her had an "adverse impact" on her educational performance. *Id*. at 27-28, 36. There are no similar findings here *for any child*. Instead, the court improperly found delays alone constitute a denial of FAPE. *See, e.g.*, JA1224-25. For yet another reason, then, the court acted in an inappropriately generalized fashion, where IDEA contemplates that any child actually denied a FAPE would seek individualized relief through appropriate procedural means.

### D.    There are no findings that the programmatic requirements in the injunction are designed to cure a current harm.

The court's order imposing programmatic requirements falls short of the requirement that an injunction be narrowly tailored to remedy the specific harm found. The injunction contains programmatic requirements that are based on Dr. Dunst's 2011 rather than 2015 testimony. JA210-13, 439, 459, 464, 476, 1244. He opined that the programmatic recommendations were necessary for an effective and sustainable child-find system. JA643.

Dr. Dunst repeated his recommendations in his written testimony in 2015 as: "I recommended the following improvements in my earlier testimony[]" or "in

58

2011, I recommended the following." JA439-41, 459. Dr. Dunst admitted that he did not reexamine those matters for the 2015 trial. JA640, 644. No other witness for plaintiffs addressed the recommendations, but the District's expert addressed each and found the District in compliance. JA534-53, 576-86.

The court acknowledged that plaintiffs failed to address the programmatic requirements, JA1147-48, 1186, 1217, but found it irrelevant that the District's undisputed evidence showed compliance and ordered continued compliance, JA1244-47 ("The District shall satisfy, or *continue to satisfy*…." (emphasis added)). The court erroneously concluded that, because its 2011 injunction (vacated by this Court) "imposed programmatic requirements, which would not terminate until the numerical benchmarks were met[,]" those requirements could be imposed again without evidence supporting them. JA1216.

There may have been evidence at the first trial that the District's programs were insufficient and supported an order imposing programmatic requirements but that evidence was missing years later, in 2015. *Cf. Cobell*, 428 F.3d at 1076 (noting how, in intervening 17-month period, defendants made progress); *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) ("The problems with the breadth of the injunction are underlined by the passage of time and the intervening events in this case."). Plaintiffs did not demonstrate, nor did the court find, that the injunction is designed to "remedy" a *current* harm or threat of harm. This Court

59

should vacate that injunction, and for similar reasons all the declaratory relief (including relief for long-past violations, JA357-99, 1081-1109, 1233-37).  The court's finding that the District has "sustained compliance" for more than five years on those past violations, JA1095, demonstrates that the current success of the child-find programs is durable and the judgment was improper.

## CONCLUSION

The Court should vacate the class certification, liability, and remedial orders and order the case dismissed as moot.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Lucy E. Pittman
LUCY E. PITTMAN
Assistant Attorney General
Bar Number 483416
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 727-3881
(202) 741-5925 (fax)
lucy.pittman@dc.gov

January 2017

60

**CERTIFICATE OF SERVICE**

I certify that on January 26, 2017, electronic copies of this final brief were

served through the Court's ECF system, to:

> Bruce J. Terris, Esq.
> Todd A. Gluckman, Esq.
> Terris, Pravlik & Millian, LLP
>
> Jon Greenbaum, Esq.
> Lawyers' Committee for Civil Rights Under Law

/s/ Lucy E. Pittman
LUCY E. PITTMAN

**CERTIFICATE OF COMPLIANCE**

I further certify that this brief complies with the type-volume limitation in

Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,833

words, excluding exempted parts.  This brief complies with the typeface and type

style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because

it has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in Times New Roman 14 point.

/s/ Lucy E. Pittman
LUCY E. PITTMAN